Lawrence C. Hinkle II (SBN 180551)
lhinkle@sandersroberts.com
Jonathan Z. Morris (SBN 345401)
jmorris@sandersroberts.com
**SANDERS ROBERTS LLP**
515 S. Flower Street, 24th Floor
Los Angeles, CA 90071
Telephone: (213) 426-5000
Facsimile:  (213) 234-4581

Attorneys for Plaintiff
**GUNNA TOURING, LLC**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| GUNNA TOURING, LLC<br><br>    Plaintiff,<br><br>        v.<br><br>MICKLE AND MICKLE PRODUCTIONS, a purported business entity; DAPHNEY MICKLE GOLDEN, an individual; STARS IN ACTION, INC., a California nonprofit corporation; RAIZA RANGL, an individual; and EZEKIEL BOTTORFF, an individual<br><br>    Defendants. | **CASE NO.   2:26-cv-02842**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Case No.:

COMPLAINT

Plaintiff Gunna Touring, LLC ("Plaintiff"), by and through undersigned counsel, brings this action against Defendants Mickle And Mickle Productions, a purported business entity; Daphney Mickle Golden ("Golden"), an individual; Stars in Action, Inc. ("Stars in Action"), a California nonprofit corporation; Raiza Rangl ("Rangl"), an individual; and Ezekiel Bottorff ("Bottorff"), an individual (collectively, "Defendants"), and alleges as follows:

**INTRODUCTION**

1. This is a diversity action arising from Defendants' failure to pay a $750,000 performance fee owed to Plaintiff under a written Performance Agreement for the appearance of recording artist Sergio Kitchens, professionally known as "Gunna," at the X Games event in Aspen, Colorado.

2. Purporting to act on behalf of an entity identified as "Mickle And Mickle Productions," Defendants negotiated and executed a written Performance Agreement with Plaintiff for Gunna to perform at the X Games event in Aspen, Colorado on January 22, 2026.

3. The Agreement provided for a guaranteed performance fee of $500,000 and stated that the payment obligation was secured by collateralization of certain assets described in an attached transaction document.

4. The Agreement required that payment of the performance fee be initiated no later than 11:59 p.m., venue local time, on January 22, 2026. The Agreement further provided that if payment was not initiated by that deadline, an additional contingency fee of $250,000 would become due within five business days.

5. Plaintiff fully performed its contractual obligations by furnishing the artist to perform as agreed.

6. Defendants never initiated payment by the contractual deadline and have never paid any portion of the performance fee.

7. As a result of Defendants' failure to initiate payment as required under the Agreement, the full contractual amount of $750,000 became due and payable.

Case No.:

COMPLAINT

8.　Despite the absence of secured or initiated funds, Defendants and their agents repeatedly represented before and after the performance that payment was secured or imminent in order to induce Plaintiff to proceed with the performance and to delay enforcement of Plaintiff's contractual rights.

9.　Plaintiff brings this action to recover the unpaid contractual amount together with damages arising from Defendants' fraudulent inducement and misrepresentations concerning the Agreement and the purported security for the performance fee.

## PARTIES

10.　Plaintiff Gunna Touring, LLC is a limited liability company organized under the laws of the State of Georgia.

11.　Plaintiff's sole member is Sergio Kitchens, an individual domiciled in the State of Georgia.

12.　Plaintiff is therefore a citizen of the State of Georgia for purposes of diversity jurisdiction under 28 U.S.C. §1332.

13.　Defendant Daphney Mickle Golden ("Golden") is an individual domiciled in the State of New York.

14.　Golden represented herself to Plaintiff and third parties as the Chief Executive Officer and Founder of "Mickle And Mickle Productions."

15.　Defendant Mickle And Mickle Productions is identified in the Performance Agreement as the contracting party responsible for payment of the performance fee owed to Plaintiff.

16.　Upon information and belief, "Mickle And Mickle Productions" is not a duly formed corporation, limited liability company, or other legally recognized entity in any jurisdiction.

17.　Plaintiff conducted searches of public corporate registries in multiple jurisdictions, including California, New York, Georgia, Illinois, Virginia, and Delaware, and was unable to locate any registered entity named "Mickle And Mickle

- 2 -

Case No.:

Productions," "Mickle and Mickle Productions," or "Mickel and Mickel Productions."

18.     The purported entity is therefore believed to be a trade name, fictitious business name, or nonexistent principal used by Golden and/or other Defendants in connection with the conduct described herein.

19.     Defendants nonetheless held "Mickle And Mickle Productions" out as a legally existing business entity during negotiations and execution of the Performance Agreement, represented that the entity possessed assets sufficient to secure payment of the performance fee, and executed contractual documents in the entity's name. Upon information and belief, no such legally formed entity existed at the time those representations were made.

20.     Defendant Stars in Action, Inc. ("Stars in Action") is a nonprofit public-benefit corporation organized under the laws of the State of California.

21.     Stars in Action is therefore a citizen of California for purposes of diversity jurisdiction under 28 U.S.C. §1332.



22.     According to records maintained by the California Secretary of State, Stars in Action lists a principal address of 6202 Sagebrush Bend Way, San Diego, California and a mailing address of 12807 Sherman Way, North Hollywood, California.

23.     Defendant Raiza Rangl ("Rangl") is an individual domiciled in the State of California.

24.     Rangl is, upon information and belief, the Chief Executive Officer of Stars in Action, Inc., and directed and participated in the conduct described in this Complaint.

25.     Defendant Ezekiel Bottorff ("Bottorff") is an attorney licensed in the State of California and domiciled in the State of California.

26.     Bottorff practices entertainment and media law through Famous Media Law LLC, which lists its headquarters and principal place of business in Los Angeles,

California, within the Central District of California.

27.    Bottorff participated in the drafting and transmission of agreements relating to the transaction described in this Complaint.

28.    Bottorff signed an Indemnity Agreement on behalf of "Mickle And Mickle Productions" as "Authorized Counsel," representing that he possessed authority to bind the entity.

29.    Upon information and belief, Bottorff also participated in communications with Plaintiff and third parties concerning the Performance Agreement and the purported arrangements securing payment of the performance fee.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

31.    Plaintiff is a citizen of Georgia, Defendant Golden is a citizen of New York, and Defendants Stars in Action, Rangl, and Bottorff are citizens of California. Complete diversity therefore exists between Plaintiff and all Defendants.

32.    The amount in controversy exceeds $75,000, as Plaintiff seeks recovery of at least $750,000 in unpaid contractual compensation, exclusive of interest, costs, and other recoverable damages.

33.    This Court has personal jurisdiction over Defendants because they purposefully directed activities toward California and this District, and Plaintiff's claims arise out of those forum-directed activities.

34.    Defendants Stars in Action, Rangl, and Bottorff reside in California and conducted substantial portions of the conduct described in this Complaint from within the Central District of California.

35.    Defendant Golden, although domiciled in New York, engaged in intentional conduct expressly aimed at California, including coordinating with California-based Defendants, participating in communications directed to and from

- 4 -

Case No.:

COMPLAINT

this District, and inducing Plaintiff's performance through representations concerning payment and security made in connection with California-based individuals, entities, and legal counsel.

36.    Golden knew that the contractual relationship, related legal work, and associated payment obligations were being administered in substantial part through California-based individuals and entities, and that the effects of Defendants' nonpayment and misrepresentations would be felt in this District.

37.    California is therefore a focal point of Defendants' conduct and the resulting harm, and Golden could reasonably anticipate being haled into court in this District in connection with the claims asserted herein.

38.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §1391(b)(1) because multiple Defendants reside in this District.

39.    Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

40.    In January 2026, Defendants began negotiating with Plaintiff for the appearance of recording artist Sergio Kitchens p/k/a "Gunna" at the X Games event in Aspen, Colorado scheduled for January 22, 2026.

41.    During these negotiations, Defendants represented that they were acting on behalf of an entity identified as "Mickle And Mickle Productions."

42.    Defendants represented that Mickle And Mickle Productions possessed the financial resources necessary to pay the contractual performance fee and that the payment obligation would be secured through collateralized assets.

43.    Defendants further represented that payment of the performance fee would be timely initiated in accordance with the terms of the Performance Agreement.

/ / / /

*The Performance Agreement and Payment Obligations*

44. On or about January 22, 2026, Defendants negotiated and executed a written Performance Agreement with Plaintiff for Gunna to perform at the X Games event.

45. The Agreement identified Mickle And Mickle Productions as the "Purchaser" responsible for payment of the performance fee.

46. The Agreement guaranteed Plaintiff a $500,000 performance fee for the appearance.

47. The Agreement further required that payment be initiated no later than 11:59 p.m., venue local time, on January 22, 2026.

48. The Agreement also provided that if payment was not initiated by that deadline, an additional contingency fee of $250,000 would become due within five business days.



49. The Agreement represented that the performance fee obligation was secured by collateralization of certain assets described in an accompanying transaction document. A true and correct copy of the Performance Agreement is attached hereto as **Exhibit A**.

50. Upon information and belief, at the time Defendants executed and transmitted the Performance Agreement, no payment had been initiated, and no funds had been secured to satisfy the contractual payment obligation.

51. Despite the absence of initiated or secured funds, Defendants executed and transmitted the Performance Agreement after the contractual payment initiation deadline had already passed, representing that the contractual payment obligation would nonetheless be satisfied.

*Pre-Performance Representations That Funding Was Secured*

52. During negotiations and execution of the Performance Agreement, Defendants represented that the contractual payment obligation would be secured by assets and financing arrangements sufficient to guarantee payment of the performance

fee.

53. Upon information and belief, at the time these representations were made, Defendants had not secured the assets, financing, or collateral they represented would guarantee payment of the performance fee.

54. Defendants nevertheless represented to Plaintiff that payment was secure in order to induce Plaintiff to allow the performance to proceed.

*Plaintiff Fully Performs Under the Agreement*

55. Relying on Defendants' representations and the terms of the Performance Agreement, Plaintiff proceeded with the scheduled appearance.

56. On January 22, 2026, Gunna performed at the X Games event in Aspen, Colorado as required under the Agreement.

57. Plaintiff fully performed all contractual obligations required under the Performance Agreement.

*Defendants Fail to Initiate Payment as Required*

58. Despite the express contractual requirement that payment be initiated no later than 11:59 p.m. venue local time on January 22, 2026, Defendants failed to initiate payment by that deadline.

59. Defendants also failed to provide any confirmation that funds had been secured, escrowed, or otherwise deployed to satisfy the contractual payment obligation.

60. As a result of Defendants' failure to initiate payment as required under the Agreement, the full contractual amount of $750,000 became due and payable.

61. Defendants have never paid any portion of the performance fee.

*Post-Performance Misrepresentations Concerning Funding and Payment*

62. After the performance, Defendant Golden engaged in repeated communications with Plaintiff's representatives concerning payment of the performance fee.

63. On January 23, 2026, Golden transmitted via email what she described



Case No.:

COMPLAINT

as a "fully filled out agreement by both principal parties" despite the fact that the contractual deadline for initiating payment had already passed and no payment had been initiated.

64. That communication copied multiple participants in the transaction, including Plaintiff's representatives, Bottorff, a representative from the X Games's legal department, and an email address identified as "The Secret."

65. On January 29, 2026, nearly one week after the performance and with no payment initiated, Plaintiff's representatives sent Defendants an email requesting an immediate update concerning the status of payment.

66. Golden responded via email that Defendants were attempting to identify the "exact hour at which funds can be released."

67. On January 30, 2026, after Plaintiff demanded immediate payment, Golden represented in writing that "GUNNA would be receiving a $600,000.00 payment regardless of receipts/expenditures," stated that Defendants were "waiting for the New York office to release funds," and represented that "Gold Commodity funding would not be released until Monday or Tuesday of next week."

68. In her email, Golden further assured Plaintiff that she was "doing everything within my Power to release funds as rapidly as possible" and would provide "daily check-ins."

69. On February 2, 2026, Plaintiff again demanded immediate payment and wire confirmation, stating that the continued lack of response or payment was "extremely concerning" and requesting confirmation "asap."

70. In response, Golden emailed Plaintiff's representatives that she preferred to communicate with "definitives, with images/ photos + and tracking numbers," and represented that she was "wait[ing] for stakeholders to release proof and images" concerning the release of funds.

71. Later that same day, Golden sent another email, representing that a "Gold payment [was] still pending." She further stated that a "Stakeholder in Mickle And

- 8 -

Case No.:

COMPLAINT

Mickle Productions release of funds [was] still pending" and that Defendants would "make good on our commitment to pay and see this through."

72.    In that same communication, Golden transmitted a document styled as a "Commission Fee Agreement" referencing a "500MT – Gold Sale" transaction and identifying Golden as head of a transaction group.

73.    Golden transmitted this document as purported proof that an active gold commodity transaction existed and that funds from that transaction were available and would be released to satisfy Plaintiff's payment.

74.    In this email, Golden further represented that Defendants were "waiting for the Second Stakeholder to release funds," that a prior stakeholder had "took a hard pass," and that she could not "expedite the work of the Gold Transaction," which she described as a "multibillion-dollar transaction involving multiple nations."

75.    Also in this email, Golden assured Plaintiff that the transaction would close "either today (Friday, February 6, 2026) or Monday (February 9, 2026)" and urged Plaintiff not to pursue legal action, stating that Defendants had given "NO indication that we would NOT PAY!"

76.    Later that day, in response to an email notifying Defendants that legal action would proceed, Golden responded via email that she "cannot even let the stakeholders know about this turn of events," and again assured Plaintiff that "we will pay as repeatedly stated."

77.    After that closing date passed without payment, Golden again emailed Plaintiff on February 10, 2026, stating that "we will definitely pay" and represented that a "major alcohol brand" had agreed to handle the outstanding payment. In this email, Golden further requested that Plaintiff "continue to standby as we resolve this matter this week."

78.    On February 16, 2026, Golden emailed Plaintiff that she was "reverting to the initial fee of $750,000.00 due to this extensive delay, regardless of receipts" while again representing that Defendants were "waiting patiently for funds from a

major alcohol brand," that funds could be "pulled and borrowed from the NYC Iconic St. Paddy's Day Parade," and that her "commodity transactions are in queue" with release of funds "scheduled for February 2026."

79.   Despite these repeated assurances, Defendants never initiated payment and never provided wire confirmation, escrow documentation, banking records, or any other objective evidence that funds had been secured or transferred.

80.   Throughout these post-performance communications with Defendants, Plaintiff repeatedly demanded immediate payment and warned that legal action would be pursued if payment was not initiated. In response, Defendants repeatedly assured Plaintiff that payment was forthcoming and that funding transactions were in progress, causing Plaintiff to temporarily refrain from initiating legal proceedings in reliance on those assurances.

81.   Defendants repeated assurances to Plaintiff occurred weeks after the contractual payment initiation deadline had passed and after the full $750,000 obligation had matured. Despite those circumstances, Defendants continued to represent that funding transactions were pending and that payment would be made, causing Plaintiff to delay enforcement of its contractual rights.

82.   These statements confirm that, weeks after the contractual payment initiation deadline had passed and the full $750,000 obligation had matured, Defendants were still attempting to secure third-party funding and had not encumbered, reserved, segregated, or deployed funds sufficient to satisfy Plaintiff's contractual entitlement.

83.   Upon information and belief, no binding or funded gold transaction existed that secured Plaintiff's payment at the time any of these representations were made.

84.   Upon information and belief, no sponsorship funds, stakeholder funds, parade funds, commodity funds, or other third-party funding source referenced by Defendants was ever secured, encumbered, or deployed to satisfy Plaintiff's

- 10 -

Case No.:

COMPLAINT

contractual entitlement.

85. These repeated and escalating assurances were made to induce Plaintiff's continued reliance and delay enforcement of its contractual rights.

86. Plaintiff refrained from immediate legal action in reliance upon these representations.

***Evolving Funding Representations and Involvement of Additional Participants***

87. During post-performance communications, Defendants represented that payment of the performance fee would be funded through various transactions, including sponsorship arrangements and commodity-related transactions.

88. Defendants represented that these funding arrangements involved additional individuals who were purportedly responsible for coordinating or facilitating the transfer of funds.

89. In WhatsApp communications concerning the Agreement and the expected payment, Defendants introduced or copied individuals identified as participants in the purported funding arrangements.

90. For example, an individual identified as Lamont Health informed Plaintiff's representatives that another individual identified as "G" would be "handling the wire transactions for the deposit."

91. An individual identifying himself as "G (X Games)" subsequently communicated with Plaintiff's representatives and stated that he was working with Lamont Health and assisting another individual identified as "Lu" in connection with the transaction.

92. In addition, Defendants consistently copied an email address identified as "The Secret" (gcaboverde@gmail.com) on communications concerning the Performance Agreement and the anticipated payment of the performance fee.

93. In a WhatsApp communication, Lamont Health provided Plaintiff's representatives with the email address (gcaboverde@gmail.com) as a contact associated with the transaction.

- 11 -

Case No.:

COMPLAINT

94. Upon information and belief, Defendants represented that these individuals were involved in the financing or collateral arrangements purportedly securing payment of the performance fee.

***Role of Stars in Action and Rangl in the Transaction***

95. During the period following the performance, Rangl, acting on behalf of Stars in Action and holding herself out as its Chief Executive Officer, participated in communications with Plaintiff's representatives concerning expenses associated with the event and the contractual payment obligation

96. In WhatsApp communications on January 24, 2026, Plaintiff's representatives requested an update concerning payment of the performance fee. Rangl responded that Defendants were "still on track to meet full contractual obligations" and requested that Plaintiff remain patient while payment was being processed.



97. In WhatsApp communications on January 25, 2026, Plaintiff's representatives reported that the hotel where the artist and his team were staying advised that a credit card associated with Defendants had been "blocked" from further charges, leaving the artist and his team unable to retrieve their belongings and facing hotel charges of approximately $50,000. Plaintiff's representatives further reported that the individual Defendants had represented was "handling the wire transactions" stopped responding to communications after the performance occurred, despite repeated requests to resolve the situation. These events directly contradicted Defendants' repeated representations that payment obligations and event-related expenses had been secured and were being handled in the ordinary course.

98. In response to Plaintiff's WhatsApp messages on January 25, 2026, Rangl stated that she "personally paid $7,800 to Luis for the first night of the hotel. Per the contract Luis signed, this expense was Gunna's responsibility."

99. Rangl further asserted that complaints regarding the failure to pay the performance fee were premature, stating:

- 12 -

COMPLAINT

Case No.:

"It is also important to address the current complaints regarding payment. We are still within the contractually defined five (5) business-day payment window. Complaints or pressure related to payment timing during this period are not warranted and are inconsistent with the agreement."

100. Rangl also asserted that expenses associated with the event would be deducted from the payment owed to Plaintiff, stating:

"Any individual or entity that has paid for hotel accommodations will be reimbursed via deductions from Gunna's final payment. As a result, the final payment amount will be less than the $750,000 guarantee, reflecting those offsets."

101. Under the Performance Agreement, Purchaser agreed to "provide and pay, at no cost to Artist, any and all rider requirements."

102. Furthermore, the Performance Agreement expressly provides that there shall be "NO charge backs to Company or Artist of any kind (including, but not limited to in relation to labor and/or production costs) under any circumstances" unless expressly agreed to in writing by Plaintiff or the Artist.

103. Plaintiff did not agree, either in writing or otherwise, to any charge backs, deductions, offsets, or reductions to the guaranteed Performance Fee or Contingency Fee.

104. Accordingly, the guaranteed Performance Fee and Contingency Fee were not subject to offset, deduction, charge back, or reduction for production costs, labor expenses, hotel accommodations, sponsorship shortfalls, or any other third-party funding issues.

105. Rangl's statements demonstrate her participation in communications concerning the payment obligation and Defendants' attempt to reduce or alter the guaranteed amount owed to Plaintiff after the performance had already occurred and after Defendants had already received the benefit of Plaintiff's performance.

***The Indemnity Agreement and Bottorff's Participation***

106. During the course of the parties' communications concerning the

- 13 -

Case No.:

COMPLAINT

Performance Agreement and the payment obligation owed to Plaintiff, Defendants transmitted additional documents purporting to address the parties' contractual obligations.

107. Among these documents was an Indemnity Agreement transmitted by Defendant Bottorff.

108. The Indemnity Agreement purports to provide indemnity from "Mickle And Mickle Productions" in connection with the Performance Agreement concerning the performance of recording artist Sergio Kitchens p/k/a "Gunna."

109. Bottorff executed the Indemnity Agreement on behalf of "Mickle And Mickle Productions" as "Authorized Counsel."

110. By executing the Indemnity Agreement in that capacity, Bottorff represented that he possessed authority to bind Mickle And Mickle Productions with respect to the obligations described in the document.

111. Upon information and belief, Bottorff transmitted the Indemnity Agreement to multiple participants in the transaction, including representatives of Plaintiff and representatives of the X Games event. A true and correct copy of the Indemnity Agreement is attached hereto as **Exhibit B**.

*Use of a Nonexistent Contracting Entity*

112. After Defendants failed to make payment, Plaintiff conducted searches of public corporate registries to identify the contracting entity.

113. Plaintiff was unable to locate any legally registered entity named "Mickle And Mickle Productions" or "Mickel and Mickel Productions."

114. Upon information and belief, the purported contracting entity either does not exist or was used as a fictitious business name or trade name by Defendants.

115. Defendants nonetheless continued to represent that the entity existed and possessed assets sufficient to satisfy the contractual obligation.

*Coordinated Conduct of Defendants to Induce Performance and Avoid Payment*

116. The conduct described above reflects a coordinated course of action

Case No.:

COMPLAINT

among Defendants and their agents, employees, representatives, and associates who collectively negotiated the Performance Agreement, communicated representations concerning secured funding for the performance fee, introduced purported funding participants, and participated in communications concerning the payment obligation owed to Plaintiff.

117.    Through these coordinated actions, Defendants created the appearance that financing had been arranged and that payment of the performance fee was secure, despite Defendants' failure to initiate payment or provide proof that funds had been secured.

118.    At all relevant times, Defendants and their agents, employees, representatives, and associates acted in concert with one another and within the course and scope of their respective roles in negotiating, executing, and performing—or purporting to perform—the Performance Agreement described above. As a result of this concerted conduct, Defendants jointly participated in the acts giving rise to Plaintiff's claims and are jointly and severally liable for the damages resulting from that conduct.

119.    The conduct described above reflects a coordinated scheme in which Defendants represented that payment of the $750,000 performance fee was secured through collateralized assets, stakeholder funding, and commodity transactions that purportedly existed or were imminent. In reality, upon information and belief, and known to Defendants at the time those representations were made, no such secured funding existed. After Plaintiff furnished the contracted performance, Defendants repeatedly represented that funds would be released shortly, that funding transactions were pending, and that payment was forthcoming, while failing to initiate payment or provide any objective proof that funds had been secured. These misrepresentations and omissions were made to induce Plaintiff to perform under the Agreement and to delay enforcement of Plaintiff's contractual rights while Defendants attempted to obtain funding after the contractual payment obligation had already matured.

Case No.:

## COUNT I

## BREACH OF CONTRACT

### (Against All Defendants)

120.   Plaintiff incorporates by reference the allegations of paragraphs 40 through 62, as though fully set forth herein.

121.   The Performance Agreement is a valid, binding, and enforceable contract supported by consideration.

122.   Plaintiff fully performed all obligations required under the Agreement, including furnishing the artist to perform as contracted.

123.   Under Section 3 of the Agreement, Defendants were required to initiate payment of the $500,000 Performance Fee no later than 11:59 PM venue local time on January 22, 2026.

124.   The Agreement further provides that if payment of the Performance Fee was not initiated by that deadline, the $250,000 Contingency Fee automatically became due within five business days.

125.   The contractual obligation to initiate payment was not contingent upon ticket sales, sponsorship receipts, commodity transactions, stakeholder funding, or any third-party financing event.

126.   The Agreement expressly prohibits "NO charge backs to Company or Artist of any kind (including, but not limited to in relation to labor and/or production costs) under any circumstances" unless expressly agreed to in writing. Accordingly, the guaranteed Performance Fee and Contingency Fee were not subject to offset, deduction, reduction, or charge back for production costs, labor expenses, sponsorship shortfalls, or any third-party funding issue.

127.   Defendants did not initiate payment of the Performance Fee by the contractual deadline.

128.   No payment was initiated at any time thereafter.

129.   Because payment was not initiated by the deadline, the full $750,000



SANDERS
ROBERTS

Case No.:

contractual obligation matured in accordance with the express terms of the Agreement.

130.   Defendants have never paid any portion of the Performance Fee or Contingency Fee.

131.   Defendants have never provided wire confirmation, escrow documentation, banking records, or any objective proof that payment was initiated.

132.   On January 23, 2026, after the payment initiation deadline had passed and after Plaintiff had performed, Golden executed and transmitted the fully executed Agreement, thereby ratifying the full contractual obligation, including the Contingency Fee.

133.   Defendants' failure to initiate payment by the deadline and failure to pay the matured $750,000 obligation constitute material breaches of the Agreement.



134.   Golden executed the Agreement while purporting to act as Chief Executive Officer of "Mickle And Mickle Productions." To the extent "Mickle And Mickle Productions" was not a legally existing entity at the time the Performance Agreement was executed, Golden was acting on behalf of a nonexistent principal. Under established principles of agency law, a person who enters into a contract on behalf of a nonexistent principal is personally liable for the contractual obligations incurred in that principal's name.

135.   The amount due under the Agreement is a fixed and certain sum of $750,000 capable of exact calculation from the terms of the Agreement.

136.   Under California Civil Code § 3287(a), a party is entitled to prejudgment interest on damages that are certain or capable of being made certain by calculation from the date the right to recover vested.

137.   Because the contractual payment obligation became fixed and certain under the terms of the Agreement, Plaintiff is entitled to recover prejudgment interest on the $750,000 contractual amount from the date the obligation became due until judgment is entered.

Case No.:

138. As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in the amount of at least $750,000, together with pre- and post-judgment interest as allowed by law.

## COUNT II

### INTENTIONAL MISREPRESENTATION (FRAUD)

(Against All Defendants)

139. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

140. Under California law, one who willfully deceives another with the intent to induce that person to alter his or her position to his or her injury or risk is liable for any damage which that person thereby suffers. (Cal. Civ. Code §§ 1709–1710.)

141. During negotiations, execution of the Performance Agreement, and the period following Plaintiff's performance, Defendants—including Golden, Rangl, Bottorff, and other participants acting on Defendants' behalf—made numerous representations of material fact to Plaintiff concerning the existence of secured funding and the availability of funds to satisfy the contractual payment obligation.

142. Among other things, Defendants represented that:

    a.    The contractual payment obligation was secured by collateralized assets and financing arrangements;

    b.    Funding sources existed that would guarantee payment of the performance fee;

    c.    Gold commodity transactions were pending and would generate funds to satisfy Plaintiff's payment;

    d.    Stakeholder funding and other financial transactions were in progress that would result in the release of payment to Plaintiff; and

    e.    Payment would be released promptly once those funding sources were finalized.

143. These representations were material because they concerned the

Case No.:

COMPLAINT

existence of funds available to satisfy the guaranteed performance fee and were intended to assure Plaintiff that payment was secure.

144. At the time these representations were made, Defendants knew that the representations were false or made them recklessly without regard for their truth.

145. Specifically, upon information and belief, Defendants had not secured collateralized assets, financing arrangements, stakeholder funding, commodity transaction proceeds, sponsorship funds, or any other funding source capable of satisfying the contractual payment obligation owed to Plaintiff at the time the representations were made.

146. Defendants made these representations with the intent to induce Plaintiff to:

      a.     Proceed with the scheduled performance; and

      b.     Refrain from immediately pursuing legal action to enforce its contractual rights.

147. Plaintiff reasonably relied upon Defendants' representations in allowing the performance to proceed and in temporarily refraining from initiating legal proceedings while Defendants repeatedly represented that payment was forthcoming.

148. Plaintiff's reliance on these representations was reasonable because Defendants represented that they were acting through an entity that possessed sufficient financial resources and because Defendants repeatedly reaffirmed that payment was secured and forthcoming.

149. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff has suffered damages, including but not limited to the unpaid $750,000 contractual performance obligation, together with additional damages according to proof.

150. Defendants' conduct was intentional, fraudulent, and carried out with conscious disregard for Plaintiff's rights, entitling Plaintiff to recover punitive damages pursuant to California Civil Code § 3294.

Case No.:

COMPLAINT

## COUNT III

## PROMISSORY FRAUD

### (Against All Defendants)

151. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

152. During the period following Plaintiff's performance and after the contractual payment initiation deadline had passed, Defendants made numerous promises regarding future payment of the performance fee.

153. These promises included, among others, representations that:

    a. Payment would be released once certain stakeholder funding transactions were finalized;

    b. Funds would be generated through a gold commodity transaction that was represented to be in progress;

    c. A major alcohol brand had agreed to resolve the outstanding payment obligation;

    d. Defendants would provide daily updates while funds were being released; and

    e. Payment would be made within days once the referenced funding sources were finalized.

154. Defendants made these promises to induce Plaintiff to continue relying on Defendants' assurances and to refrain from immediately pursuing legal remedies.

155. Upon information and belief, Defendants had not secured any funding source capable of satisfying the $750,000 contractual obligation, including any stakeholder funding, commodity transaction proceeds, sponsorship funds, or other financing arrangements.

156. At the time these promises were made, Defendants had no intention of performing them.

157. Defendants' promises regarding future payment were therefore false

when made.

158. Plaintiff reasonably relied on Defendants' promises by temporarily refraining from initiating legal proceedings while Defendants repeatedly represented that payment would be forthcoming.

159. Plaintiff's reliance was reasonable in light of Defendants' repeated assurances that funding transactions were pending and that payment would be released shortly.

160. As a direct and proximate result of Defendants' false promises, Plaintiff has suffered damages, including but not limited to the unpaid $750,000 contractual performance obligation, together with additional damages according to proof.

161. Defendants' conduct was intentional, fraudulent, and carried out with conscious disregard for Plaintiff's rights, entitling Plaintiff to recover punitive damages pursuant to California Civil Code §3294.

**COUNT IV**

**FRAUDULENT CONCEALMENT**

(Against All Defendants)

162. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

163. Defendants concealed and failed to disclose material facts known to them concerning the existence of funding available to satisfy the contractual payment obligation owed to Plaintiff.

164. The concealed facts included, among other things:

a. That Defendants had not secured collateralized assets, financing arrangements, stakeholder funding, sponsorship funds, or commodity transaction proceeds capable of satisfying Plaintiff's payment;

b. That no binding gold commodity transaction existed that would generate funds to satisfy the contractual payment obligation;

c. That no payment had been initiated or secured at the time

Case No.:

COMPLAINT

Defendants represented that payment was forthcoming.

165. These facts were material because they directly concerned Defendants' ability to satisfy the guaranteed performance fee owed under the Performance Agreement.

166. Defendants had a duty to disclose these material facts to Plaintiff.

167. This duty arose because:

a. Defendants possessed exclusive knowledge of material facts concerning the absence of secured funding and the lack of any actual transaction capable of generating payment;

b. Defendants actively concealed those facts by repeatedly representing that funding transactions and stakeholder releases were pending; and

c. Defendants made partial representations regarding funding sources and financial transactions that were misleading without disclosure of the true facts.

168. Defendants intentionally failed to disclose these material facts in order to induce Plaintiff to proceed with the performance and to refrain from immediately pursuing legal remedies after Defendants failed to perform.

169. Plaintiff was unaware of the concealed facts and could not reasonably have discovered them.

170. Plaintiff reasonably relied on Defendants' concealment by allowing the performance to proceed and by temporarily refraining from initiating legal proceedings while Defendants continued to represent that payment was forthcoming.

171. As a direct and proximate result of Defendants' concealment of material facts, Plaintiff has suffered damages, including but not limited to the unpaid $750,000 contractual obligation, together with additional damages according to proof.

172. Defendants' conduct was fraudulent, malicious, and carried out with conscious disregard for Plaintiff's rights, entitling Plaintiff to recover punitive

Case No.:

damages pursuant to California Civil Code §3294.

## COUNT V

## NEGLIGENT MISREPRESENTATION

(Against All Defendants)

173. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

174. Defendants—including Golden, Rangl, Bottorff, and other participants acting on Defendants' behalf—made numerous representations to Plaintiff concerning the existence of funding and the availability of funds to satisfy the contractual payment obligation owed under the Performance Agreement.

175. These representations included statements that:

a.     The contractual payment obligation was secured by collateralized assets and financing arrangements;

b.     Funding sources existed that would guarantee payment of the performance fee;

c.     A gold commodity transaction was pending that would generate funds to satisfy Plaintiff's payment;

d.     Stakeholder funding and other financial transactions were in progress that would result in the release of payment to Plaintiff.

176. These representations were material because they concerned Defendants' ability to satisfy the guaranteed performance fee owed to Plaintiff.

177. When Defendants made these representations, they had no reasonable grounds for believing them to be true.

178. Defendants either made these representations directly or authorized, directed, ratified, or participated in the representations made by the other Defendants.

179. Defendants intended that Plaintiff rely on these representations in allowing the performance to proceed and in refraining from immediately pursuing legal remedies.

Case No.:

180. Plaintiff reasonably relied on Defendants' representations by allowing the performance to proceed and by temporarily refraining from initiating legal proceedings while Defendants represented that payment was forthcoming.

181. Plaintiff's reliance was reasonable because Defendants repeatedly represented that funding transactions were pending and that payment would be released shortly.

182. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff has suffered damages, including but not limited to the unpaid $750,000 contractual obligation, together with additional damages according to proof.

## COUNT VI

### CIVIL CONSPIRACY

(Against All Defendants)

183. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

184. As alleged in Counts II through V, Defendants committed tortious acts including intentional misrepresentation, promissory fraud, fraudulent concealment, and negligent misrepresentation.

185. Defendants agreed and conspired with one another to commit the tortious conduct described in Counts II through V, including misrepresenting that secured funding existed and that payment of the performance fee was guaranteed.

186. The purpose of the conspiracy was to create the false appearance that funding existed and that payment of the performance fee was secure in order to induce Plaintiff to proceed with the performance and to delay enforcement of Plaintiff's contractual rights.

187. In furtherance of this agreement, Defendants knowingly and intentionally participated in a coordinated course of conduct that included:

    a. Negotiating and executing the Performance Agreement while

representing that funding had been secured;

b.    Introducing purported funding participants and stakeholders into communications concerning the transaction;

c.    Transmitting documents and communications that purported to demonstrate the existence of funding transactions;

d.    Repeatedly representing that funds would be released shortly once pending transactions were finalized.

188.    Each Defendant knew of the wrongful nature of the conduct and knowingly participated in and intended to assist in carrying out the fraudulent scheme.

189.    Each Defendant committed overt acts in furtherance of the conspiracy, including participating in communications, transmitting documents, or making representations concerning the purported funding arrangements.

190.    Through this coordinated conduct, Defendants collectively created the appearance that financing had been arranged and that payment of the performance fee was secure.

191.    As a direct and proximate result of Defendants' conspiracy and the tortious acts committed in furtherance of that conspiracy, Plaintiff has suffered damages, including but not limited to the unpaid $750,000 contractual obligation, together with additional damages according to proof.

192.    Because the acts alleged in Counts II through V were carried out pursuant to a common plan and agreement among Defendants, each Defendant is jointly and severally liable for the damages resulting from those acts.

## COUNT VII

### AIDING AND ABETTING FRAUD

(Against Stars in Action, Rangl, and Bottorff)

193.    Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

194.    As alleged in Counts II through V, Defendants engaged in fraudulent

- 25 -

Case No.:

COMPLAINT

conduct including intentional misrepresentation, promissory fraud, fraudulent concealment, and negligent misrepresentation.

195. Defendants Stars in Action, Rangl, and Bottorff knew or should have known of the fraudulent conduct described above.

196. Despite that knowledge, these Defendants knowingly and substantially assisted the fraudulent scheme.

197. This assistance included, among other things:

a. Participating in communications concerning the purported funding arrangements;

b. Reinforcing representations that payment would be made or that funding sources existed;

c. Transmitting or facilitating the transmission of documents or communications concerning the purported transaction;

d. Representing or implying that the contractual payment obligation was secured or would soon be satisfied.

198. Rangl, acting on behalf of Stars in Action and holding herself out as its Chief Executive Officer, participated in communications concerning the payment obligation and represented that Defendants remained "on track to meet full contractual obligations."

199. Rangl represented that she had personally paid $7,800 toward event-related expenses and further asserted that those expenses would be deducted from Plaintiff's payment obligation, thereby reinforcing the false premise that payment of the performance fee was otherwise forthcoming despite the absence of secured funding.

200. Defendant Bottorff transmitted an Indemnity Agreement purporting to provide contractual assurances from "Mickle And Mickle Productions" and executed that document on behalf of Mickle and Mickle Productions as "Authorized Counsel," thereby representing that the entity had the authority and capacity to satisfy the

- 26 -

Case No.:

COMPLAINT

obligations described therein.

201. These acts substantially assisted the fraudulent scheme by creating the appearance that the transaction was legitimate and that payment of the performance fee was secure.

202. Defendants Stars in Action, Rangl, and Bottorff knew or should have known that their conduct would assist the fraudulent scheme.

203. By knowingly providing substantial assistance to the fraudulent conduct described in Counts II through V, these Defendants are liable for the resulting damages.

204. As a direct and proximate result of this conduct, Plaintiff has suffered damages including but not limited to the unpaid $750,000 contractual obligation, together with additional damages according to proof.

## COUNT VIII

### UNJUST ENRICHMENT / RESTITUTION

(Against All Defendants)

205. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

206. Plaintiff conferred substantial benefits upon Defendants by furnishing the performance of recording artist Sergio Kitchens p/k/a "Gunna" at the X Games event in Aspen, Colorado.

207. Defendants knowingly accepted and retained the benefits of that performance.

208. Defendants obtained those benefits without providing the compensation promised for the performance.

209. As a result, Defendants have been unjustly enriched at Plaintiff's expense.

210. It would be inequitable and unjust for Defendants to retain the benefits obtained through Plaintiff's performance without paying the agreed compensation.

Case No.:

COMPLAINT

211. To the extent the Performance Agreement is determined to be unenforceable, invalid, or otherwise not binding on any Defendant, Plaintiff seeks restitution of the benefits conferred upon Defendants.

212. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff is entitled to restitution in an amount to be proven at trial, including but not limited to the value of the performance furnished by Plaintiff, together with any additional restitutionary relief the Court deems just and proper.

## COUNT IX

### LIABILITY OF AGENT ACTING FOR NONEXISTENT PRINCIPAL

(Against Golden and Bottorff)

213. Plaintiff incorporates by reference the allegations of paragraphs 40 through 119 as though fully set forth herein.

214. In connection with the negotiation and execution of the Performance Agreement and related documents, Defendants Golden and Bottorff each represented that they were acting on behalf of an entity identified as "Mickle And Mickle Productions."

215. Golden executed and transmitted the Performance Agreement representing that Mickle And Mickle Productions was the contracting party responsible for payment of the performance fee.

216. Bottorff executed and transmitted an Indemnity Agreement purporting to provide indemnity from Mickle And Mickle Productions in connection with the Performance Agreement and signed that document as "Authorized Counsel" on behalf of Mickle And Mickle Productions.

217. By executing these documents, Golden and Bottorff each represented that Mickle And Mickle Productions existed and possessed the authority and capacity to undertake the contractual obligations described in those documents.

218. Plaintiff reasonably relied on those representations in entering into and performing under the Performance Agreement.

- 28 -
Case No.:
COMPLAINT

219.   After Defendants failed to make payment, Plaintiff conducted searches of public corporate registries and was unable to locate any legally registered entity named "Mickle And Mickle Productions" or "Mickel And Mickel Productions."

220.   Upon information and belief, Mickle And Mickle Productions does not exist as a legally formed entity.

221.   Under established principles of agency law, a person who purports to act on behalf of a nonexistent principal becomes personally liable for the contractual obligations incurred in the name of that purported principal.

222.   Accordingly, to the extent Mickle And Mickle Productions does not exist or lacked the legal capacity to enter the Performance Agreement or Indemnity Agreement, Golden and Bottorff are personally liable for the contractual obligations incurred in the name of that purported entity.

223.   As a direct and proximate result of these representations, Plaintiff has suffered damages including but not limited to the $750,000 contractual payment obligation, together with additional damages according to proof.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

    a.  Compensatory damages in the amount of at least $750,000, or such amount as proven at trial;

    b.  Restitution and disgorgement of all benefits unjustly retained by Defendants;

    c.  Punitive and exemplary damages pursuant to California Civil Code §3294;

    d.  Pre-judgment interest pursuant to California Civil Code §3287 and post-judgment interest as permitted by law;

    e.  Costs of this action; and

    f.  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

This 17th day of March 2026.

Respectfully Submitted,


**SANDERS ROBERTS LLP**

Lawrence C. Hinkle, II, Esq.
Jonathan Z. Morris, Esq.
Attorneys for Plaintiff
**GUNNA TOURING, LLC**

- 30 -

COMPLAINT

Case No.: